**Leroy J. RASANEN, as Administrator of the Estate of John C. Rasanen, deceased, Plaintiff,**

v.

**Daniel BROWN, James W. Dewar, John W. O'Brien, Keith M. Skala, Tyler R. Finn, Tammy M. Mickoliger, Rodney C. Polite, Alan T. Brock, Michael Etherton, David H. Verne, Scott G. Dibble, Robert A. Buell, Paul C. Antonovich, Timothy C. Pidgeon, Bartosz J. Chilicki, and Michael Pellegrino, Defendants.**

No. 04–CV–1995 (ADS)(ARL).

United States District Court,
E.D. New York.

March 25, 2009.

Harry H. Kutner, Jr., Mineola, NY, for the Plaintiff.

Office of the New York State Attorney General, by Assistant Attorney General Dorothy O. Nese, of Counsel, Mineola, NY, for the Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Leroy Rasanen ("the Plaintiff") brings this civil rights action pursuant to 42 U.S.C.1983 ("Section 1983"), alleging that the Defendants, New York State Troopers, used excessive force in fatally shooting his son John Rasanen ("Rasanen") during a search of Rasanen's home. Presently before the Court is the Defendants' motion for summary judgment.

## I. BACKGROUND

In December of 2000, the New York State Police Narcotics Enforcement Unit ("NEU") received information from a con- fidential informant that Rasanen was sell- ing drugs out of multiple locations on the East End of Long Island. In concert with the Suffolk County Police Department, the NEU used surveillance, wiretaps, and un- dercover operations to gather information about Rasanen and his alleged drug activi- ties. Pursuant to this investigation, a search warrant was issued for Rasanen's residence at 12 Overlook Drive in Aque- bogue, New York.

The warrant was executed by the New York State Police's Mobile Response Team ("MRT"), an eight-person contingent that included Defendants Daniel Brown, Mi- chael Etherton, David Verne, Scott Dibble, Paul Antonovich, Robert Buell, and Timo- thy Pidgeon. Prior to executing the war- rant, the MRT received two operational briefings. During these briefings the offi- cers discussed, among other issues, intelli- gence that suggested Rasanen was in pos- session of firearms and had previously threatened police officers.

There is a dispute between the parties as to when, exactly, the warrant was exe- cuted. However, it suffices to say that the MRT arrived at Rasanen's residence on the morning of May 17, 2002 at some point between 5:45 and 6:00 a.m., the time speci- fied in the warrant. Brown and Etherton were the first pair of officers to arrive at Rasanen's front door and entered the resi- dence after Brown breached the door with a battering ram. As the officers dispersed throughout Rasanen's home, they an- nounced that they had a search warrant and identified themselves as members of the New York State Police.

As Brown and Etherton followed Buell down a flight of stairs, they turned left into a darkened hallway illuminated only by Brown's flashlight. The Officers made their way down the hallway with Brown proceeding in front of Etherton until they came to Rasanen's bedroom door. With

Etherton positioned behind him, Brown kicked open Rasanen's bedroom door yelling "police, get down!"

By this time Rasanen had been wakened and was standing close to his bedroom door. According to Brown, he entered the room with a weapon in his right hand and a flashlight in the other which revealed that Rasanen was standing off to his right one to four feet from him. Brown testified in his deposition that Rasanen ignored his warnings to get down, charged him and attempted to wrest his gun away. Brown alleges that a struggle ensued and that he felt Rasanen attempt to push his gun up towards his face as Rasanen pressed himself against Brown's flashlight. Brown alleges that, during the course of the struggle, he dropped the flashlight, brought his left hand back to his gun and, fearing for his life, shot Rasanen in the chest from close range.

The only other eyewitness to the shooting was Angela Chinnici ("Chinnici") who watched the encounter unfold from her vantage point in Rasanen's bed. According to Chinnici, she wakened Rasanen after hearing male voices and the pounding of doors upstairs. Chinnici testified in her deposition that Rasanen got out of bed and stood "very close," to the doorway of his bedroom. Chinnici confirms that when Brown entered the bedroom he identified himself as a police officer and instructed she and Rasanen to get down. Although Chinnici testified that she observed Rasanen facing the door, "rocking" back and forth while Brown was in the room, she denies that Rasanen ever lunged at or struggled with Brown before or at the time the fatal shot was fired.

Defendant Tammy Mickoliger arrived on the scene at Rasanen's residence shortly after 6:00 a.m. and, after removing Chinnici from the home, returned to Rasanen's bedroom to assist Defendants Paul Antonovich and Michael Pellegrino in ad-

ministering CPR. Notwithstanding their efforts, Rasanen was pronounced dead by the EMT who arrived while the Defendants were providing CPR.

The Plaintiff filed an amended complaint on August 4, 2004, alleging that the shooting constituted excessive force in violation of the Fourth Amendment and that the Defendants were negligent in failing to conduct the search and deal with Rasanen's shooting "in accordance with professional norms and standards." Although the amended complaint also alleged violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments, the Plaintiff has withdrawn these causes of action.

## II. DISCUSSION

### A. Section 1983

■ In order to state a valid claim under 42 U.S.C. § 1983, a plaintiff must show that the conduct in question deprived him of a right, privilege, or immunity secured by the Constitution or the laws of the United States, and that the acts were attributable at least in part to a person acting under color of state law. *Washington v. County of Rockland,* 373 F.3d 310, 315 (2d Cir.2004). The Second Circuit has long recognized that plaintiffs asserting claims under Section 1983 must allege the personal involvement of each defendant. *Back v. Hastings On Hudson Union Free School Dist.,* 365 F.3d 107, 122 (2d Cir. 2004) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). Under Section 1983, a police officer is personally involved in the use of excessive force only if he either directly participates in the conduct giving rise to the claim or was present and yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so. *See Thomas v. Roach,* 165 F.3d 137, 146 n. 3 (2d Cir.1999) (noting that police officers have a duty to prevent other officers in

their presence from using excessive force); *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

■ Here, the Plaintiff has failed to offer allegations or evidence to show that any of the Defendants other than Brown and Etherton could be held liable under Section 1983 for the use of excessive force. Defendants James Dewar, John O'Brien, Keith Skala, Tyler Finn, Tammy Mickoliger, Rodney Polite, Alan Brock, David Verne, Scott Dibble, Robert Buell, Paul Antonovich, Timothy Pidgeon, Bartosz Chilicki, and Michael Pellegrino were not in Brown's presence when he shot Rasanen and therefore could not possibly have had a reasonable opportunity to intervene. These Defendants are therefore entitled to summary judgment on the Plaintiff's Section 1983 excessive force claim.

## B. The Summary Judgment Standard in Qualified Immunity Cases

It is well-settled that summary judgment is proper only where no genuine issue of material fact exists to present to the trier of fact. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden of showing the absence of any material factual dispute rests with the party seeking summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In evaluating the record, the Court must resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (1986). Here, Brown and Etherton seek summary judgment on the basis that they are entitled to qualified immunity.

■ "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In this regard, the doctrine of qualified immunity "balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

■ Courts perform a two-part inquiry to determine whether an official is entitled to qualified immunity. *Pearson,* 129 S.Ct. at 815–18. Courts generally look first to whether the plaintiff's allegations, if true, establish a constitutional violation. *Id.* at 816. "[I]f the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

■ "In other words, if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995). Where facts relevant to the qualified immunity defense are seriously disputed, a court may not reach the ultimate legal question of whether a reasonable police officer should have known that he acted unlawfully. *Lennon,* 66 F.3d at 421 (citing *Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.1990),

and *Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir.1994)).

## C. The Plaintiff's Section 1983 Excessive Force Claim

Brown and Etherton argue that Brown's use of deadly force in response to the perceived threat posed by Rasanen was objectively reasonable and that they are therefore entitled to qualified immunity. Here, there is no question that the Plaintiff has alleged a violation of a clearly-established constitutional right in contending that Brown used excessive force in shooting Rasanen. *See Thomas,* 165 F.3d at 143 (recognizing that the Fourth Amendment "protects against the use of excessive force by police officers in carrying out an arrest."). The question for the Court on summary judgment, then, is whether there are material facts in dispute that go to whether Brown's conduct was objectively unreasonable.

The Plaintiff makes much of a factual dispute as to what time the MRT began their execution of the search warrant for Rasanen's home. However, the Court fails to perceive and the Plaintiff makes no convincing effort to explain how this dispute—whether the officers entered Rasanen's residence at 5:45 a.m. rather than 6:00 a.m. as specified in the warrant—has any bearing on the *material* issue of whether Brown used excessive force. It does not follow that the Plaintiff's excessive force claim should go to a trier of fact simply because there is a dispute concerning whether Brown and other officers entered Rasanen's home several minutes before the time prescribed in the warrant.

The Plaintiff also offers ballistic evidence that he claims casts doubt on Brown's version of the shooting. The Plaintiff's expert, Ronald Scott, determined that based upon the trajectory of the bullet hole left in Rasanen's wall, Brown could not have fired the shot from inside the bedroom doorway. After analyzing the powder burns on Rasanen's chest, Scott also disputed the Suffolk County Ballistics Examiner's finding that Rasanen was shot from a distance of nine to eighteen inches.

With respect to the first issue, it must be noted that Brown never testified that he fired the fatal shot while standing in Rasanen's bedroom doorway. In fact, when the Plaintiff's counsel asked Brown in his deposition about his precise location when the gun discharged, Brown said "I don't know if I was already starting to go back out into the hallway, or if I was in the threshold, or still in the room." If Brown never testified that he shot Rasanen from the bedroom doorway, then ballistic evidence which purports to show he could not have fired the shot from the doorway is immaterial. On the other hand, the ballistics expert's finding that the powder burns on Rasanen's chest suggested that he was shot from a distance further than nine to eighteen inches does amount to a material disputed issue of fact. The distance from which Rasanen was shot has some bearing on the credibility of Brown's version of the encounter and could go to the reasonableness of deadly force.

A disputed issue of material fact also arises from the differing accounts offered by Brown and Chinnici—the only two surviving eyewitnesses. Brown maintains that he shot Rasanen because he feared for his life after Rasanen charged him and attempted to wrest his gun away. Chinnici contends that Rasanen never lunged at or struggled with Brown either before or after the shot was fired. This material discrepancy between Brown's and Chinnici's account of the shooting presents a classic triable issue of fact as to whether Brown's conduct was objectively unreasonable and precludes summary judgment. *See Thomas,* 165 F.3d at 142 (finding that

"[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

### D. The Plaintiff's Negligence Cause of Action

 The Plaintiff alleges that the Defendants were negligent: in failing to adequately plan the search; in failing to provide an on-site medical technician in the event of an injury; in failing to administer appropriate first aid; and in "creating a mind-set of 'shoot first and ask questions later,'" by sharing intelligence that suggested Rasanen was armed and violent with MRT officers. In the context of the present case, in order to prevail on a common law negligence claim, the Plaintiff would be required to show that in executing the warrant, the Defendants did not exercise that degree of care which would reasonably be required of police officers under similar circumstances. *See McCummings v. New York City Transit Auth.*, 81 N.Y.2d 923, 597 N.Y.S.2d 653, 613 N.E.2d 559, 560 (1993). In deciding not to address the merits of this cause of action, the Defendants have failed to carry their burden to show that there is no genuine triable issue with respect to their alleged negligence. Accordingly, the Defendants' motion for summary judgment on the Plaintiff's negligence cause of action is denied.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the Defendants' motion for summary judgment on the Plaintiff's Section 1983 claim is **GRANTED** as to Defendants James Dewar, John O'Brien, Keith Skala, Tyler Finn, Tammy Mickoliger, Rodney Polite, Alan Brock, David Verne, Scott Dibble, Robert Buell, Paul Antonovich, Timothy Pidgeon, Bartosz Chilicki, and Michael Pellegrino and

**DENIED** as to Defendants Daniel Brown and Michael Etherton, and it is further

**ORDERED,** that the Defendants' motion for summary judgment on the Plaintiff's negligence cause of action is **DENIED.**

**SO ORDERED.**